1

1        UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

2

3

4    UNITED STATES OF AMERICA            )
                                         )
5                                        )
     vs.                                 )   CR No. 19-10081-IT
6                                        )
                                         )
7    LAURA JANKE                         )

8

9    BEFORE:  THE HONORABLE INDIRA TALWANI

10

11                          PLEA

12

13   APPEARANCES:

14        OFFICE OF THE UNITED STATES ATTORNEY (By: Eric S. Rosen,
          AUSA, Justin D. O'Connell, AUSA, Leslie Wright, AUSA),
15        One Courthouse Way, Boston, Massachusetts 02210.  On
          Behalf of the Government.

16
          HUGGARD LAW LLC (By: Stephen G. Huggard, Esq.), 470
17        Atlantic Avenue, Boston, Massachusetts 02210.  On Behalf
          of the Defendant.

18

19           John Joseph Moakley United States Courthouse
                          Courtroom No. 9
20                        One Courthouse Way
                          Boston, MA 02210
21                     Tuesday, May 14, 2019
                           11:30 a.m.

22

23                  Cheryl Dahlstrom, RMR, CRR
                       Official Court Reporter
24        John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3510
25                      Boston, MA 02210
              Mechanical Steno - Transcript by Computer

|   |   |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  U.S. District Court is now in session. |
| 3 | The Honorable Judge Indira Talwani presiding.  This is Case No. |
| 4 | 19-cr-10081, United States v. Laura Janke.  Will counsel please |
| 5 | identify themselves for the record. |
| 6 | MR. ROSEN:  Good morning, your Honor.  Eric Rosen, |
| 7 | Justin O'Connell, and Leslie Wright for the government. |
| 8 | THE COURT:  Good morning. |
| 9 | MR. HUGGARD:  Good morning, your Honor.  Stephen |
| 11:31 10 | Huggard, Huggard Law LLC, for the defendant, Laura Janke, who's |
| 11 | present in the courtroom. |
| 12 | THE COURT:  Good morning. |
| 13 | So I understand that Ms. Janke is looking to plead |
| 14 | guilty here this morning, is that correct? |
| 15 | MR. HUGGARD:  Correct, your Honor. |
| 16 | THE COURT:  Let's start out by having the clerk |
| 17 | administer the oath. |
| 18 | (Defendant sworn.) |
| 19 | THE CLERK:  Please state your name for the record. |
| 11:31 20 | THE DEFENDANT:  Laura Janke. |
| 21 | THE CLERK:  Thank you. |
| 22 | THE COURT:  Ms. Janke, do you understand you're now |
| 23 | under oath; and if you answer any of my questions falsely, your |
| 24 | answers may later be used against you in another prosecution |
| 25 | for perjury? |

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  And you may consult with your counsel at

3     any time during these proceedings.

4          How old are you, Ms. Janke?

5          THE DEFENDANT:  Thirty-six.

6          THE COURT:  What education level have you attained?

7          THE DEFENDANT:  Master's degree.

8          THE COURT:  As you stand here today, are you under the

9     influence of any drug or alcoholic beverage of any kind?

11:32 10        THE DEFENDANT:  No.

11         THE COURT:  Have you taken any medicine, prescription

12    or otherwise, that could affect your ability to understand

13    these proceedings and to testify truthfully?

14         THE DEFENDANT:  No, your Honor.

15         THE COURT:  As you stand here today, is there any

16    reason that you may not be able to understand the nature and

17    consequences of these proceedings?

18         THE DEFENDANT:  No, your Honor.

19         THE COURT:  Have you received a copy of the

11:32 20    Indictment, the written charge, against you?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Count 1 charges you with conspiracy to

23    commit racketeering, in violation of 18 U.S.C. Section 1962(d),

24    from in or about 2011 and continuing through February 2019.

25    The Indictment also includes forfeiture allegations.  Do you

1    understand the charges?

2        THE DEFENDANT:  Yes, your Honor.

3        THE COURT:  Do you understand that you're represented

4    by counsel?

5        THE DEFENDANT:  Yes, your Honor.

6        THE COURT:  Have you fully discussed the charges

7    against you and the facts and circumstances of this case with

8    counsel?

9        THE DEFENDANT:  Yes, your Honor.

11:33 10        THE COURT:  Are you fully satisfied with the counsel,

11    representation, and advice given to you in this case by your

12    attorney?

13        THE DEFENDANT:  Very satisfied.

14        THE COURT:  To counsel, have you communicated all

15    formal offers from the prosecution to accept a plea on terms

16    and conditions that may be favorable to the accused?

17        MR. HUGGARD:  I have, your Honor.

18        THE COURT:  And I understand, Ms. Janke, that you have

19    entered into a plea agreement with the United States Attorney's

11:33 20    Office, is that correct?

21        THE DEFENDANT:  Yes.

22        THE COURT:  I have a signed copy here dated -- you

23    signed on April 21st.  Is that your signature?

24        THE DEFENDANT:  Yes, that's my signature.

25        THE COURT:  Okay.  Did you have an opportunity to read

1    the agreement and discuss it with your lawyer before you signed

2    it?

3              THE DEFENDANT:  Yes, I did.

4              THE COURT:  Does the plea agreement contain all the

5    terms to which you have agreed?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Do you understand the terms of the plea

8    agreement?

9              THE DEFENDANT:  Yes.

11:34 10              THE COURT:  And, now, I understand -- I have another

11    document that's marked under seal.  I understand from the

12    assistant U.S. attorney that that isn't supposed to be under

13    seal.

14              MR. ROSEN:  Correct, your Honor.  We filed it on the

15    docket with the consent of the defendant.

16              MR. HUGGARD:  That was with our consent, your Honor.

17              THE COURT:  Okay.  Probably would have been better to

18    strike off the sentence on the first page that says "under

19    seal" so you wouldn't cause panic every time it surfaces.

11:34 20              MR. ROSEN:  Sorry.

21              THE COURT:  But -- okay.

22              So you did sign a second agreement, is that correct.

23              THE DEFENDANT:  Yes, your Honor.

24              THE COURT:  And so these two agreements are the only

25    agreements you have with the United States Government, is that

1   correct?

2           THE DEFENDANT:  Yes.

3           THE COURT:  And has anyone made any promises or

4   assurances to you that are not in these two agreements?

5           THE DEFENDANT:  No.

6           THE COURT:  And has anyone threatened or pressured you

7   in any way to persuade you to accept these agreements?

8           THE DEFENDANT:  No.

9           THE COURT:  And do you understand that you cannot

11:35 10  withdraw your plea if I do not accept the sentencing

11  recommendation in the plea agreement?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  And do you understand that, with regard to

14  the second agreement, while there is an agreement that, if you

15  provide substantial assistance, the U.S. Attorney will file a

16  motion to recommend the Court impose a sentence below the

17  advisory guidelines, the determination under that agreement as

18  to whether you did or did not provide substantial assistance

19  rests solely in the discretion of the U.S. Attorney?  Do you

11:36 20  understand that?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  And more than that, it's based not just on

23  your truthfulness but on the value the government finds with

24  regard to your cooperation; do you understand that?

25          THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  So, for example, if circumstances develop

2    and your assistance isn't needed, they would not be obligated

3    to make such a motion even if you were willing and able to

4    provide the assistance; you understand that?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Do you understand that you cannot withdraw

7    your plea if I do not accept the sentencing recommendation

8    there?

9          THE DEFENDANT:  Yes, your Honor.

11:37 10          THE COURT:  And are you pleading guilty then of your

11   own free will?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Do you understand the offense to which

14   you're pleading guilty is a felony?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Do you understand that if I accept your

17   plea you will be judged guilty of that offense?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Do you understand that by being judged

11:37 20   guilty you may lose valuable civil rights, including the right

21   to vote in many states, the right to hold public office, to

22   serve on a jury, and the right to possess a gun or any kind of

23   firearm or ammunition?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Are you a United States citizen?

1        THE DEFENDANT:  Yes.

2        THE COURT:  Okay.  I'm going to turn to Mr. Rosen now.

3  If you could please state the maximum possible penalties

4  provided by law.

5        MR. ROSEN:  Judge, this is a one-count conspiracy --

6  Indictment charging the defendant with conspiracy to commit

7  racketeering, violation of Title 18 United States Code Section

8  1962(d).  Penalty of up to 20 years in prison; supervised

9  release for three years; fine of $250,000, twice the gross gain

11:38 10  or loss; special assessment of $100; restitution; and

11  forfeiture to the extent charged in the Indictment.  I do

12  believe for her there was forfeiture charged for the --

13  essentially the amount of bribes that we could allot to Ms.

14  Janke.  That's set forth in Paragraph 131 of the Indictment.

15        THE COURT:  And to be specific, the government is

16  looking for a $356,047 forfeiture money judgment against Ms.

17  Janke and another defendant and $7,750 to be entered in the

18  form of a money judgment against Ms. Janke, is that correct?

19        MR. ROSEN:  That's in the Indictment.  And then in the

11:39 20  plea agreement, we actually have a specific forfeiture amount

21  that we have allotted the two -- the amount of bribes were

22  essentially -- if I could just explain, were deposited into

23  football accounts -- by "football," I guess we mean soccer --

24  the accounts in the name of the football clubs that was jointly

25  controlled by Janke and Defendant Khosroshahin.  That's spelled

1    K-h-o-s-r-o-s-h-a-h-i-n.  And so we've been able to determine

2    approximately what the value was that was delivered to Ms.

3    Janke.  And that's set forth in Paragraph 6(a) of the plea

4    agreement, and that amount is $134,213.90.  That would be the

5    forfeiture judgment that we will seek.

6         THE COURT:  Okay.  So that -- let me get to that page.

7    Actually, we'll turn to that in a minute when I turn to the

8    plea.

9         We were at this point talking about the maximum

11:40 10   sentences that I could impose, and the maximum sentence would

11   be forfeiture as charged in the Indictment, correct?

12        MR. ROSEN:  Correct.

13        THE COURT:  And then if you could please state the

14   disposition the government has agreed to recommend under the

15   plea agreement.  And you've given us that now for forfeiture

16   but for the incarceration, fine.

17        MR. ROSEN:  Right.  We've -- the parties agree, your

18   Honor, that it essentially is a total level of 18, which is

19   determined from the base offense level of 7 plus 12 for the

11:41 20   loss.  So that would be a 19.  It's the same under either the

21   RICO guideline or under the -- sort of the offense level

22   guideline as calculated in 2E1.1 of the guidelines.  You have a

23   plus two of for abuse of position of trust and then minus three

24   for, obviously, acceptance.  And you get a 18, which I believe

25   in this case would be 27 to 33 months, your Honor.

1          THE COURT:  And --

2          MR. HUGGARD:  Just for the record, your Honor, I'm not

3     sure the question was answered.  The government has agreed to

4     recommend the low end, and the defendant has not taken a

5     position.  We're free to recommend what we want.

6          MR. ROSEN:  Correct.

7          THE COURT:  Okay.  With regard to the position of

8     trust, maybe you can address that when we get to the details of

9     the case that the government would be able to prove.

11:41 10        MR. ROSEN:  Sure, statement of facts, yeah.

11         THE COURT:  So let me make sure, Ms. Janke, that you

12    understand how sentencing would work and how the guidelines

13    work here.  The sentencing guidelines have been issued by the

14    United States Sentencing Commission.  I'm required to make my

15    own calculation and consider what the correct calculation is of

16    the guidelines before determining your sentence.  So I may

17    disagree with the parties as to what the correct guideline

18    sentence is.

19         Beyond that, the sentencing guidelines are something I

11:42 20   am required to take into consideration, but I can vary, depart,

21    from those guidelines and either sentence you for more time or

22    less time than the sentencing -- than would be covered by the

23    sentencing guidelines.  Do you understand that?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  So because I am not bound by the plea

1    agreement, I can also consider any of the additional conduct

2    concerning you and your criminal history, crimes you may have

3    committed, uncharged or dismissed conduct, that is included in

4    the Presentence Report on a -- facts -- just proving the facts

5    to a preponderance of the evidence standard, not beyond a

6    reasonable doubt; do you understand that?

7                   THE DEFENDANT:  Yes, your Honor.

8                   THE COURT:  So if there are additional facts here, for

9    example, regarding tax treatment of the money or other issues,

11:44 10   I'm free to consider that on sentencing; do you understand?

11                  THE DEFENDANT:  Yes, your Honor.

12                  THE COURT:  And, therefore, because I'm not required

13   to follow the sentencing guidelines and I am required to

14   consider all of the factors under the sentencing statutes, I

15   could impose a sentence that is longer or less than your plea

16   agreement, you understand that?

17                  THE DEFENDANT:  Yes, your Honor.

18                  THE COURT:  And that I would have the authority to

19   impose a sentence up to the maximum, do you understand that?

11:44 20                  THE DEFENDANT:  Yes, your Honor.

21                  THE COURT:  With regard to restitution here, what is

22   the -- what's on the table for that?

23                  MR. ROSEN:  Again, your Honor, this would be sort of

24   any -- under United States -- Lagos v. United States, it would

25   be any cost incurred by the victim here, USC, in terms of, you

1   know, obviously, you know, fees incurred through the

2   investigation as it pertains to the federal investigation that

3   they were assisting the government with.

4            THE COURT:  Okay.  Do you understand that, that the

5   victim may be entitled to fees for their expenses during the

6   government's investigation?

7            MR. HUGGARD:  That might be a theory, your Honor.  We

8   haven't agreed to that.

9            THE COURT:  Is there an appeal waiver in this case?

11:45 10          MR. HUGGARD:  There is, your Honor.

11           THE COURT:  Okay.  We'll get to that.

12           Let's talk about the rights that you're giving up here

13  by pleading guilty, make sure that you understand those.  Do

14  you understand that there may be legal challenges to the

15  charges that have been brought against you, including

16  challenges to venue in the District of Massachusetts, or there

17  could have been a motion to suppress evidence or a challenge

18  that there is a legal defect in the Indictment, and you will

19  have waived all of those legal challenges if I accept your plea

11:46 20  of guilty?

21           THE DEFENDANT:  Yes, your Honor.

22           THE COURT:  And now I'm going to go through the trial

23  rights that you have and make sure that you understand those

24  rights that you are giving up.

25           Do you understand that you have the right to plead not

1   guilty to the offense charged against you and to go to trial?

2         THE DEFENDANT:  Yes, your Honor.

3         THE COURT:  Do you understand you have the right to

4   trial by jury?

5         THE DEFENDANT:  Yes, your Honor.

6         THE COURT:  Do you understand a jury is composed of 12

7   jurors who must find beyond a reasonable doubt that you

8   committed the crime with which you're charged before you may be

9   found guilty?

11:46 10         THE DEFENDANT:  Yes, your Honor.

11         THE COURT:  Do you understand at trial you would be

12   presumed to be innocent, and the government would have to prove

13   your guilt beyond a reasonable doubt?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  Do you understand that at trial you would

16   have the right to the assistance of counsel for your defense?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  Do you understand you would have the right

19   to see and hear all the witnesses against you and to have them

11:46 20   cross-examined in your defense?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  Do you understand you would have the

23   right, if you chose to exercise it, to testify and to put on

24   evidence in your defense?

25         THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  Do you understand you would have the right

2     to require witnesses to come to court to testify in your

3     defense?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  You understand you would have the right to

6     refuse to testify and refuse to put on evidence unless you

7     voluntarily elected to do so?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  You understand, if you decided not to

11:47 10     testify or not to put on any evidence, those facts could not be

11     used against you?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Do you further understand that by entering

14     a plea of guilty here today, if I accept your plea, there will

15     be no trial, and you will have waived, or given up, your right

16     to a trial as well as the rights that come with a trial that

17     I've just described?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  So now we turn to the appeal rights.  Do

11:47 20     you understand that, but for your plea agreement, there is a

21     right to appeal a conviction and a sentence?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  And but for the terms of your plea

24     agreement, you would have had the right to appeal your

25     conviction or to argue in a future proceeding, collateral or

1   otherwise, that your conviction should be set aside or reduced;

2   do you understand that?

3            THE DEFENDANT:  Yes, your Honor.

4            THE COURT:  And that, but for the terms of the plea

5   agreement, you would have the right to appeal any sentence I

6   impose either on direct appeal or you could challenge in a

7   future proceeding, collateral or otherwise, do you understand

8   that?

9            THE DEFENDANT:  Yes, your Honor.

11:48 10            THE COURT:  And do you understand the following appeal

11  waiver provisions in your plea agreement:  first, that you will

12  not challenge your conviction on direct appeal or in any other

13  proceeding; second, you will not challenge your sentence,

14  including any order on forfeiture, restitution, fines, or

15  supervised release, on direct appeal, or any other proceeding?

16  Do you understand that?

17            THE DEFENDANT:  Yes, your Honor.

18            THE COURT:  And that means that you are giving up the

19  right to appeal my sentence regardless of the sentence I

11:49 20  impose; do you understand that?

21            THE DEFENDANT:  Yes, your Honor.

22            THE COURT:  And with regard to this restitution issue

23  -- and maybe, Counsel, I should turn to you.  You're suggesting

24  this is an open issue, and I would tend to agree with you.  But

25  this agreement would allow me to make my determination on that

1   restitution question without any appeal rights; do you

2   understand that?

3          MR. HUGGARD:  Yeah.  Your Honor, I don't think there's

4   really -- the government wants an appeal waiver and we need

5   this deal, so we've agreed to the appeal waiver.

6          THE COURT:  And, Counsel, on this question, I had

7   talked with my colleagues recently because this appeal waiver

8   in this case and in the case that I was dealing with yesterday,

9   both is a blanket appeal waiver without regard to any limits on

11:50 10   the sentence.  And we had a discussion among the judges as to

11   whether this is the new standard appeal, and I subsequently got

12   an email from one of my colleagues that, no, in the case in

13   front of him, what he was used to in the past, which is

14   normally there's a cap and above that cap there is no appeal

15   waiver.  So is there a reason that this is being treated

16   differently?

17          MR. ROSEN:  No.  I don't know what the circumstances

18   are of that case, your Honor.

19          THE COURT:  Nor do I.  I just know it was yesterday

11:50 20   afternoon.  I got an email from my colleague.  He said, Nope,

21   wrong.  It isn't standard anymore -- it isn't a new standard in

22   the office.

23          MR. ROSEN:  Well, the -- it's a difficult question to

24   answer because the appeal -- the appeal waiver had gone under

25   some revision at approximately the same time this case was

1     coming down and we entered into the agreements.  And since

2     then, there have been insertions into plea agreements after

3     this one was entered into, I believe, where the appeal waiver

4     was -- they did have caps on the imprisonment time just like

5     they had before.

6          So the answer is, essentially, from -- based on my

7     knowledge, is that it had been -- there have been some flux as

8     to the appeal waivers both at the time of the takedown here, at

9     the time it would have been entered into, and subsequent ones.

11:51 10   So subsequent ones might look different.

11          THE COURT:  So if I were to find that I could not find

12     a plea to be knowing and voluntary where it gave me the power

13     to sentence the defendant up to 20 years without an appeal

14     right, are you suggesting this wouldn't fly in the face of a

15     policy at the U.S. Attorney's Office and maybe there would be

16     reconsideration?  Because to be honest about it --

17          MR. ROSEN:  Right.

18          THE COURT:  -- what we're really doing here is we're

19     saying, well, hopefully, the judge isn't going to do that.  But

11:52 20   I'm being given a blank check and without an appeal right.

21          MR. ROSEN:  I don't think you're being given --

22          THE COURT:  What's the difference?

23          MR. ROSEN:  With?

24          THE COURT:  With a blank check.

25          MR. ROSEN:  Well, with a -- I mean, your Honor, you

1   know, obviously, just said the starting point is the

2   guidelines.  We have a cooperation agreement in place.  I mean,

3   there's --

4           THE COURT:  There's nothing that ties my hands.  With

5   my hands being untied, I think I have a blank check.  And

6   you're saying that she can't appeal it.  And I'm saying, well,

7   if that's the case, is that a voluntary and knowing plea that

8   would understand what we're looking at here?  Because I'm not

9   sure that somebody would knowingly give away their right to

11:52 10   challenge a sentence of up to 20 years.

11           MR. ROSEN:  Well, your Honor, I respectfully disagree.

12   I think -- it says that in the plea agreement.  I think --

13           THE COURT:  It says it, but what we're doing here

14   isn't a matter of just formality.  We are -- I have an

15   obligation to ensure that a person is entering into an

16   agreement because they know and fully understand the terms of

17   the agreement, not because they're making a bet as to how I'm

18   going to work under this agreement.

19           MR. ROSEN:  I think the defendant has made a

11:53 20   calculation that it's a -- there's a certain amount of horse

21   trading in plea agreements and that the plea agreement that she

22   has received is very beneficial to her.  And that's --

23           THE COURT:  That's the normal part of the plea

24   agreement.  The part that's abnormal and -- I mean, I have to

25   say, I was surprised talking with my colleagues yesterday, but

1    talking with my colleagues, there was a bit of a startled

2    response that there is no cap on these plea agreements and that

3    my colleagues reported to me that what they are used to seeing

4    the U.S. Attorney's Office doing is saying, you know, for

5    example, if there was horse trading, you would think that the

6    cap might be what the top of the cap is of what she's giving

7    up, right?  Or what you're giving up.  That if there were other

8    charges that you could be bringing against her, that certainly

9    that would be the maximum sentence that I could be imposing

11:54 10   before she would have a right to appeal.  No?

11        MR. ROSEN:  Judge, what I can report -- what I can

12   report is that it's a plea bargain that was entered into, I

13   think, knowing and voluntarily, with experienced counsel and

14   with the defendant, who I've met and I proffered with, and as

15   part of a combined package of a plea agreement as well as a

16   cooperation agreement that are before this Court.

17        It was a plea agreement approved by my office.

18   Obviously, there are some subsequent changes to that, but this

19   was the one that was available to me as the prosecutor at the

11:55 20   time I entered into it.

21        THE COURT:  Right.  But if I say I don't find this

22   knowing and voluntary and you go back upstairs, will they --

23   will she have a cap put it in then?

24        MR. ROSEN:  Judge, I just don't know.  I have not

25   broached that issue with the front office, and I just -- I just

1   don't know.  I can -- you know, it's just -- I mean, I think it

2   was knowing and voluntary.  There's nothing indicating that (a)

3   it wasn't or that it's unfair to the defendant.  I think both

4   sides seek finality in some regards.  I think we rely on the

5   papers in front of us, the plea agreement and the cooperation

6   agreement, both of which we fully intend to honor.  I just

7   don't see how that wouldn't be knowing and --

8          THE COURT:  No.  But you're fully intending to honor

9   agreements that give you a lot of discretion.  So on the

11:56 10   cooperation end, if all of the other cases that you're

11   prosecuting end up pleading, you won't need her assistance.

12          MR. ROSEN:  Well, that's actually not how I view it,

13   your Honor, respectfully.

14          THE COURT:  How?

15          MR. ROSEN:  I view it, we generally use people's

16   cooperation to engage in plea agreements and discussions with

17   other defendants.  So it's not actually -- I've done plenty of

18   cooperation agreements where no one goes to trial and because

19   -- and it's because so many people have lined up against them.

11:56 20   I think that's probably what will happen here in this case.

21          So I don't view it as an all-or-nothing type of, you

22   know, use of cooperation.  I think she was obviously the first

23   one in the door with cooperation, and, you know, if she --

24   obviously, if substantial assistance is provided -- but it's

25   not limited to just testimony at a trial.

1          THE COURT:  I understand that.  But if you have

2     everyone cave without her -- without based on what she has to

3     say, then you have the discretion to say what she had to say is

4     not what led to everyone else pleading, correct?

5          MR. ROSEN:  I certainly do, but I think the -- one of

6     the reasons counsel wanted the plea agreement in the record is

7     so we wouldn't be able -- the plea agreement and cooperation

8     agreement in the record so we wouldn't be able to make that

9     argument.

11:57 10         THE COURT:  Well, I am not going to use the appeal

11    waiver.  I certainly am not interested in people going through

12    more of this process than they need to.  I'm not going to use

13    the appeal waiver as a reason to do that.  But I do have

14    concern.  Essentially, it -- I think it's important that pieces

15    of paper really mean what they say.  And if what really happens

16    is that, if I were to give her a 20-year sentence, it will --

17    an appeal would be heard one way or another by the First

18    Circuit.  And so the lawyers know that.  And so then this

19    becomes a little bit of theater if they're essentially saying,

11:58 20    well, if you really do something extreme, an appeal would be

21    heard despite an appeal waiver and that it would be a far

22    better practice to actually state what the actual rules are.

23         But, at any rate, at least on the face of it, the

24    agreement states that you cannot bring an appeal, and in most

25    circumstances that, in fact, would be the case; do you

1    understand that?

2                THE DEFENDANT:  Yes, your Honor.

3                THE COURT:  And, nonetheless, you do reserve the

4    right, as all defendants do, to claim that your lawyer rendered

5    ineffective assistance of counsel or that the prosecutor

6    engaged in serious misconduct in connection with appeal; you

7    understand that?

8                THE DEFENDANT:  Yes, your Honor.

9                THE COURT:  Okay.  I'm going to go through the

11:59 10   elements of the charge against you that would be -- have to be

11   proven by the United States if this case were to go to trial.

12   And then I'm going to ask them to tell us what the evidence is

13   that they would be prepared to introduce at trial.  And then

14   I'll come back and ask you if that -- if those facts are true.

15               So Count 1 charges you with conspiracy to commit

16   racketeering.  If this case went to trial, the government would

17   have to prove that there was a pattern of racketeering activity

18   substantially as stated in the Indictment, that is, to

19   facilitate cheating on college entrance exams to facilitate the

12:00 20   admission of students to elite universities as recruited

21   athletes regardless of their athletic abilities and to enrich

22   defendant personally; that it was part of the conspiracy that

23   each defendant agreed to commit at least two acts of

24   racketeering activity; that you conspired to participate in or

25   benefit from the racketeering activity; and that your

1    conspiracy to participate took the forms of at least two acts

2    in furtherance of the conduct of the affairs of the enterprise.

3    Do I have that right?

4         MR. ROSEN:  I think so, your Honor.  The only -- I

5    have basically, you know, derived from the sort of landmark

6    Salinas case, United States v. Salinas, 522 U.S. 61, 1997.

7    Basically, in order to -- I have:  In order to be guilty of a

8    RICO conspiracy, a defendant must either agree to personally

9    commit two predicate acts or agree to participate in the

12:00 10   conduct of the enterprise with the knowledge and intent that

11   other members of the conspiracy would commit at least two

12   predicate acts in furtherance of the enterprise.  So it's

13   either you do it or you know other people are doing it.

14        MR. HUGGARD:  Your Honor, I think it's a reach to say

15   that my client understands RICO law, but I think it's fair to

16   say that she understands that what -- the conduct laid out in

17   the Indictment is the conduct that she committed.  To ask her

18   to say that she understands the elements of RICO, when we could

19   have quite the discussion about it here among the lawyers in

12:01 20   the room, I think would be asking a lot.

21        THE COURT:  Then let me ask you, Mr. Huggard:  Do you

22   agree that these elements are correctly cited by Mr. Rosen?

23        MR. HUGGARD:  I think he's cited the Salinas case,

24   your Honor, and I think that -- I've seen jury instructions go

25   different ways on some of this, but I do believe the elements

1        are met by the facts that my client is prepared to admit.

2              THE COURT:  Okay.  So let's go through those facts.

3              MR. ROSEN:  If this case were to proceed to trial, the

4        evidence would show that Laura Janke, when she worked at USC as

5        a soccer coach, which goes to the abuse of position of trust,

6        received bribes from Rick Singer to recruit Singer's clients to

7        the USC soccer team.

8              THE COURT:  So can I just stop you right there?

9              MR. ROSEN:  Sure.

12:02 10            THE COURT:  Because, when I read the Indictment, it

11       said that she stopped being employed as an assistant coach of

12       women's soccer on January 10, 2014.  Is that correct?

13             MR. ROSEN:  That is correct.

14             THE COURT:  But there's evidence that you would be

15       prepared to have at trial that she was involved in this scheme

16       while she was still there?

17             MR. ROSEN:  While she was there, and then after the

18       scheme ended, she developed a different role within the

19       organization.

12:02 20            THE COURT:  Okay.  But the abuse of position of trust

21       relates to the period of time that she was an employee of USC,

22       is that correct?

23             MR. ROSEN:  Correct.  She took bribes as an employee,

24       and then after her coaching position at USC ended, she assisted

25       Singer with his fraudulent admissions scheme by creating

1   falsified athletic profiles for Singer's clients which she knew

2   would be submitted to USC and other schools to help secure

3   admission for Singer's clients as fake recruited athletes.

4          THE COURT:  And so just -- I understand you're going

5   to have some more details about that part of it.

6          MR. ROSEN:  Right.

7          THE COURT:  I'll let you get to that.  But just with

8   regard to the bribes while she was employed as an assistant

9   coach of women's soccer at USC, I guess I didn't see anything

12:03 10   in the Indictment that was specific about that, so I didn't

11   know what the government had there.

12          MR. ROSEN:  I'll go through -- her and Ali

13   Khosroshahin -- I don't know if my pronunciation is entirely

14   correct on that one.  They were -- he was the head coach.  She

15   was the assistant coach.  They accepted bribes together into

16   this sort of joint checking account for football clubs that

17   they controlled.  And in exchange for that, they admitted they

18   recruited Singer's clients who were not competitive soccer

19   players to be admitted to USC.

12:04 20          THE COURT:  Did he stay on as coach after 2014?

21          MR. ROSEN:  No.  He was fired.

22          THE COURT:  Both of them, January 10, 2014?

23          MR. ROSEN:  Right.

24          MR. HUGGARD:  Actually, I believe he left before she

25   did.

1          MR. ROSEN:  I believe it was November of 2013 maybe

2     that he left.

3          THE COURT:  Okay.

4          MR. ROSEN:  Both parts of the scheme that I outlined

5     were affected through numerous mailings, interstate wires,

6     including, but not limited to, mailing of bribe checks to

7     recipients, mailing of acceptance letters after admission,

8     interstate wires to arrange and facilitate bribes, interstate

9     wires to send college applications from the students to the

12:04 10    schools.

11          With respect to the first part of the scheme, when Ms.

12    Janke worked at USC, Singer, through both his business account

13    and his charity, the Key Worldwide Foundation, paid Laura Janke

14    and Khosroshahin approximately $300,000 in the 2012 to 2014

15    time frame.  In exchange for these bribes and without the

16    university's knowledge of the payments or the agreements to

17    admit the students as fake athletes, Janke recruited at least

18    four students to the USC women's soccer team for the purpose of

19    securing their admission to the school.  These students were

12:05 20    not competitive soccer players.

21          These students included the daughter of separately

22    charged defendant, Douglas Hodge; the daughter of separately

23    charged defendant, Toby MacFarlane; the daughter of Philip

24    Esformes, that's E-s-f-o-r-m-e-s, who was recently convicted in

25    Miami of bribing University of Pennsylvania basketball coach

1    Jerome Allen as part of a separate scheme to secure admission

2    for his son to the University of Pennsylvania as well as

3    various healthcare fraud charges.

4           In 2015, after she had left USC --

5           MR. HUGGARD:  If I can interrupt.  Just so we're

6    clear, the healthcare fraud charges has to do with that other

7    guy, in his other case.  It has nothing to do with my client.

8           MR. ROSEN:  Nothing to do with Singer.

9           THE COURT:  If we can, to the extent that we can limit

12:06 10   it to the things that -- we've got enough things to be dealing

11   with on our table without bringing in other cases.

12          MR. ROSEN:  In 2015, after she had left USC --

13          THE COURT:  Wait.  So let me just stop.  Before you

14   get to the after she left, so there were these four students.

15   And, in return, $300,000 was paid to the two of them, is the

16   allegation?

17          MR. ROSEN:  Correct.

18          THE COURT:  And, again, is this the -- paid to them

19   personally or paid to a USC checking account?

12:06 20          MR. ROSEN:  They were personally payments sent through

21   -- so a lot of coaches, what they do is, during the summer or

22   break, they'll have, like, a separate sort of camp for, like,

23   high school students.  It's a way to make money.  It's

24   completely legitimate.  What they do is they set up bank

25   account for these camps.  You know, your kid plays soccer and

1    wants to, you know, improve his skills.  He'll go to a football

2    camp during the summer or a break and pay 500 bucks a week for

3    that.

4         So Mr. Khosroshahin and Ms. Janke ran one of these

5    camps.  It had a couple of different names over the years.

6    But, essentially, what they did they had an joint checking

7    account for this camp, and so they had Singer make the payments

8    into that joint checking account for the football camp and then

9    split the payments up.

12:07 10         THE COURT:  An account with two signatories on it?

11         MR. ROSEN:  Correct.

12         MR. HUGGARD:  I'm not sure that's always true either.

13   Essentially, your Honor, the money went into the camp and led

14   to an increased profit for the camp.  That's the theory.  So

15   the camp was more profitable than it would have been otherwise,

16   and then they divided the profits because it's their camp.

17   That's how the money flows to them individually.  There are not

18   checks -- in answer to your question earlier, there were not

19   checks made personally to her.

12:07 20         THE COURT:  But they're checks from the soccer camp to

21   her?

22         MR. HUGGARD:  She gets payment out of the soccer camp,

23   and the camp gets payment from Singer.

24         MR. ROSEN:  Essentially, the money goes into the

25   soccer camp, goes back out to Mr. Khosroshahin and Ms. Janke.

1    They split it primarily 50/50, although there was a little --

2    that's sort of where we get the forfeiture amount.

3            THE COURT:  And these payments were made in return --

4    we're still talking about the pre-2014 period?

5            MR. ROSEN:  Correct.

6            THE COURT:  The payments were made in return for

7    putting these four athletes on USC's athletic recruit list?

8            MR. ROSEN:  Yes.  They were made in exchange for

9    recruiting these students who did not play competitive soccer

12:08 10   onto a USC soccer team, which is one of the top teams in the

11   nation.

12           MR. HUGGARD:  Again, I don't think they were actually

13   put on the team.  I think they were recommended into the

14   admissions process as athletes but not put on the team.

15           MR. ROSEN:  The university was both unaware of the

16   payments as well as -- the university Admissions office was

17   unaware of the payments as well as the deal, the side deal,

18   that had been struck between the coaches and Singer and the

19   families to pay the money.

12:09 20          THE COURT:  Okay.  So unlike the USC employee you

21   described yesterday, who had the money coming to a USC-owned

22   account that you stated that she controlled, here the money

23   didn't go to a USC-owned account.  It went to this private

24   soccer account?

25           MR. ROSEN:  Correct.

1         THE COURT:  Soccer club account.

2         MR. ROSEN:  Yes.

3         THE COURT:  Okay.  Thank you.

4         MR. ROSEN:  After leaving USC -- so now no abuse of

5    position of trust -- she continued to work with Singer up

6    through the time of her arrest in March of 2019.  Janke, at

7    Singer's direction, created fake athletic profiles for Singer's

8    clients, which were created to make it appear to the

9    universities that these students were legitimate athletes when,

10   in fact, they were not.

11        As examples from some of the charged defendants, Janke

12   created a falsified profile that depicted charged defendant,

13   Elisabeth Kimmel's, son as a top-ranked pole vaulter.  This

14   profile was used to secure his admission to USC.

15        Janke created a falsified profile that depicted a

16   Canadian client as an elite soccer player.  This profile was

17   used to secure admission for this Canadian student to UCLA as a

18   recruited soccer player.  The student actually received a 25

19   percent scholarship for his tuition.  The soccer coach, Jorge

20   Salcedo, also charged in this case, received $100,000.

21        Janke created falsified profiles that depicted charged

22   defendants Mossimo Giannulli, G-i-a-n-n-u-l-l-i, and Lori

23   Loughlin, L-o-u-g-h-l-i-n, their daughters as being legitimate

24   crew coxswains.  They were not.  These profiles were used to

25   secure admission for these two daughters as recruited USC

1   athletes.

2          She created other falsified athletic profiles for

3   charged defendants, including the children of William

4   McGlashan, Gamal Abdelaziz, Diane and Todd Blake, Michelle

5   Janavs, Marci Palatella, Homayoun Zadeh, amongst others.  These

6   profiles were used to secure or attempt to secure admission to

7   USC for the children of the above-mentioned charged defendants.

8          THE COURT:  So other than the one UCLA, were all the

9   others USC?

12:11 10        MR. ROSEN:  No.  There was Stanford.  Yale was a

11  student who played -- was depicted as playing, I think, on the

12  Chinese national team and various other thing.  Pretty much

13  every school that required a falsified profile and -- which is

14  most of the schools -- not every school did -- was created by

15  Ms. Janke.

16         MR. HUGGARD:  Your Honor, I'm not certain that she

17  created every profile used in this case.

18         MR. ROSEN:  No.

19         MR. HUGGARD:  To the extent Mr. Rosen said that, I'm

12:12 20  not sure that's accurate.

21         MR. ROSEN:  No.  There were different -- almost

22  everyone.  There are profiles created earlier, 2012 to 2014,

23  actually before she left USC, that were created by another

24  individual.

25         THE COURT:  Okay.  So the profiles that you've alleged

1    in the Indictment, to the extent that there are any that were

2    created before 2014, she's not involved with.  And the ones

3    2014 on, she is involved with?

4         MR. HUGGARD:  Your Honor, the ones that are listed

5    that he just read to you, those individuals, she was involved

6    in the creation of those profiles.  But there are many, many,

7    many, many students -- if you listen to Mr. Singer's plea

8    allocution, you know, he's got hundreds and hundreds and that's

9    not -- there were obviously others out there.  But the ones --

12:13 10  we're certainly acknowledging the ones that Mr. Rosen

11   referenced today.

12        THE COURT:  So let's talk about the specific ones that

13   Mr. Rosen just described.  Do you have any disagreement with

14   the facts as to those specific applications?

15        THE DEFENDANT:  No, your Honor.

16        THE COURT:  And that the allegation is that you

17   assisted in this whole fraud by making these false profiles for

18   the students that he just listed.  Any disagreement?

19        THE DEFENDANT:  No, your Honor.

12:13 20       THE COURT:  Okay.  And then, with regard to the time

21   period before you started making the false profile, while you

22   were still at USC, the allegation is that in return for money

23   to the soccer club that you and Mr. Khosroshahin -- is that

24   pronounced correctly?

25        THE DEFENDANT:  Khosroshahin.

1          THE COURT:  That in return for the payments to that

2     club, that you assisted in -- in adding the names of four

3     students as athletic recruits to USC, is that correct?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  So then are you, in fact, guilty of the

6     facts that we have just described?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  And, counsel, is there any reason the

9     Court should not take the change of plea?

12:14 10          MR. HUGGARD:  No, your Honor.

11          THE COURT:  So the clerk will please take the change

12     of plea.

13          THE CLERK:  You are charged in an Indictment with,

14     Count 1, racketeering conspiracy, all in violation of Title 18

15     United States Code Section 1962(d).  You have previously pled

16     not guilty to this charge.  Do you now wish to change your

17     plea?

18          THE DEFENDANT:  Yes.

19          THE CLERK:  How do you now plead to Count 1, guilty or

12:15 20     not guilty?

21          THE DEFENDANT:  Guilty.

22          THE CLERK:  Thank you.

23          THE COURT:  The Court finds the defendant is fully

24     competent and capable of entering an informed plea, that she is

25     aware of the nature of the charges and the consequences of the

1    plea, and that the plea of guilty is a knowing and voluntary

2    plea, supported by an independent basis in fact, containing

3    each of the essential elements of the offense charged.  The

4    plea is, therefore, accepted, and the defendant is now judged

5    guilty of this offense.

6         So I just have a few more things, but you may be

7    seated.

8         Have you already met with the Probation?

9         MR. HUGGARD:  We're going right down to Probation

12:15 10  right after this, your Honor.

11        THE COURT:  Okay.  So you will be asked to give

12    information.  Your attorney may be present.  It's important

13    that the report is accurate.  It will not only affect what

14    sentence you receive, but it also affects what happens to you

15    after you're sentenced.  For example, if you're sent to prison,

16    it will affect where you're sent and what happens to you when

17    you get there.  So even minor mistakes in the report should be

18    corrected.  You'll have a chance to read the report or -- as

19    will your counsel and to file objections to it before the time

12:16 20  of sentencing.

21        So it has been my practice in the past to hear a

22    specific sentencing recommendation from the probation officer.

23    That does not include any facts that are not in the Presentence

24    Report but that is not disclosed to either side.  However, if

25    either side has any objection to my meeting with the probation

1    officer, I will not do so.  But you need to provide that

2    objection to the -- to my clerk at the same time that the

3    objections are due to the Presentence Report.

4         At sentencing, you'll have an opportunity to speak on

5    your own behalf as will your counsel.  And so with that, I

6    refer you to the Probation Office.

7         We need a date for sentencing.  October 17th at 2:30.

8         MR. HUGGARD:  That's fine, your Honor.

9         THE COURT:  Okay.  Under my scheduling order,

12:17 10   sentencing memoranda are due a week before.

11        Any concerns about the -- continuing the initial

12   conditions of release?

13        MR. ROSEN:  No concerns.

14        MR. HUGGARD:  No, your Honor.

15        THE COURT:  So those will remain in effect.  If you

16   commit any other crimes while you are on release, you are -- it

17   may result in issuance of a warrant and a further consecutive

18   sentence.

19        So with that, I think we're done today.

12:18 20        MR. ROSEN:  Thank you.

21        MR. HUGGARD:  Thank you, your Honor.

22        THE CLERK:  Court is in recess.  All rise.

23   (Whereupon, at 12:187p.m. the hearing concluded.)

24

25

1                    C E R T I F I C A T E

2

3

4          I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10

11

12     /s/Cheryl Dahlstrom

13     Cheryl Dahlstrom, RMR, CRR

14     Official Court Reporter

15

16     Dated:  May 16, 2019

17

18

19

20

21

22

23

24

25