UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                          )   Criminal No. 1:19-cr-10081-IT<br>)<br>LAURA JANKE                      )<br>)<br>Defendant.                          )<br>) | |

**SENTENCING MEMORANDUM OF DEFENDANT LAURA JANKE**

As a young girl, Laura Janke thought about who she might invite to her college graduation or to her wedding. She never dreamed she would have to consider who should be invited to her sentencing. But here we are.

Laura is a good person, as the over fifty letters submitted on her behalf make clear. Yet she has admitted participating in Rick Singer's criminal conspiracy, an action which flies in the face of everything that she has stood for her entire life. That good life, her cooperation and her minor role in the scheme cause us to submit that she should be sentenced to time served.

One of the most difficult decisions a Court must make is how to properly sentence the individuals who appear before it. Title 18, United States Code, Section 3553 provides the framework for the Court's sentencing decision. It states in pertinent part:

**(a) FACTORS TO BE CONSIDERED IN IMPOSING A SENTENCE.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
**(2)** the need for the sentence imposed—
**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and
**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Working backwards up the list, Laura does not require any educational or vocational training or medical care or any other type of correctional treatment. Nor does the public need to be protected from Laura; she is extremely unlikely to ever commit another crime. Similarly, she does not require incarceration in order to be deterred from future criminal acts. The instant prosecution has scared and scarred her sufficiently to last a lifetime. General deterrence is a more ephemeral concept but the widespread publicity this case has received has already provided whatever general deterrence is likely to come from the prosecution; incarcerating Laura Janke will add little to that calculus. Laura has pleaded guilty to racketeering conspiracy and testified in two trials. That alone reflects the seriousness of the conduct and promotes respect for the law. The Court, of course, must determine what a "just punishment" would be. Here, the statute directs the Court to consider:

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
**(7)** the need to provide restitution to any victims of the offense.

Laura, through her plea agreement, has agreed to forfeit her ill-gotten gains. She is by no means a wealthy woman, unlike many of the defendants in this case. If the Court wishes to avoid unwarranted sentencing disparities, then Laura should be sentenced to time served, the sentence imposed on other cooperators in this case. As described below, Laura was effectively an administrative assistant in this scheme. Unlike other cooperators, moreover, she did not recruit others to the scheme or hide behind her Fifth Amendment rights while cooperating with the government. She has told the truth, the whole truth and nothing but the truth. Laura should be sentenced to time served.

It might be helpful to try to examine how Laura arrived at this unfortunate place. Before describing the context for the crime, however, it is important to remember what Laura has said many times. It is wrong to lie and it is wrong to cheat and she was raised to know the difference between right and wrong. Her actions betrayed not only her employer, but also the legions of athletes struggling to be worthy of a spot on a Division 1 athletic roster. Nothing written below is intended to diminish her culpability for her actions. As she has stated herself, she is an adult who chose to ignore her conscience. Nonetheless, context can be revealing.

Laura is a people pleaser. The character letters make that clear and the conclusion has been reinforced by the counseling she has received since her arrest. She tends to identify people in her life to follow, and she works hard to not disappoint them. One such person was her co-defendant, Ali Khosroshahin ("Ali K"). When Laura was a high school soccer player hoping to play in college, Ali K plucked her from apparent obscurity (he was scouting Laura's teammate) and recruited her to play soccer for him at Cal State Fullerton. Laura came to believe that this recruitment was a stroke of immense good fortune for which she owed Ali K everything. Of course, this diminishes both the fact that her own talent was responsible for her spot on the team and the fact that Ali K was acting in his own best interest by recruiting a quality goalkeeper.

Laura worked hard to please the mercurial coach and was selected to be team captain, another honor she attributed to Ali K and not to her own abilities. While playing at Cal State Fullerton, Laura suffered a tremendously personal and painful trauma. Unsure where to go with her pain, she turned to her coach and confided in him at a time when she was confiding in few others. This communication cemented – in her mind – her debt to her coach. When Ali K moved to the University of Southern California, he persuaded Laura to abandon her plans for nursing school and become his assistant coach. For Laura, her debt to Ali only grew. After all,

3

Ali K had brought her to the "big-time." Indeed, Ali K was only too happy to tell Laura and others that he was the reason for her success.

In retrospect, it seems clear that Ali K was acting in his own best interests, as he needed someone to "make the trains run on time." He was disorganized, and Laura was very organized. She became the logistics coach, making travel plans, keeping up with the players' schedules, comforting them when Ali K lost control of his emotions and often functioning more as an administrative assistant than as a soccer instructor. Consistent with those administrative duties, Ali K later made Laura the treasurer of his soccer camp so that the proper forms would be filed on time, etc.

None of this is a defense for what happened, but we hope it helps the Court put Laura's crime into context.

What happened is that Ali K came to know Rick Singer and decided to join forces with him. He then told Laura that he needed her assistance. He told her that lots of coaches were participating, both at USC and elsewhere, and that working with Singer would be good for them and the program. As Laura has testified, she ignored the voices in her head telling her "no" and agreed to work with Ali K. It is worth mentioning that Laura is the only assistant coach caught up in this case. The reason is obvious. Assistant coaches cannot get anyone admitted to any school. Only the head coach has that kind of influence. But Laura was needed because Ali K needed her help with the logistics. Since Ali K needed her, she agreed to participate. Simple as that. As she has testified, she trusted him with her life.

As is laid out in the presentence report, Laura began adding paragraphs to player profiles provided by Singer or others, and progressed to creating false player profiles. Initially, Singer had paid for Ali's help by putting money into the soccer program, which money was used to

better the team, such as by funding a trip to play in Europe.  Ultimately, Laura was paid for her actions, mostly through monies that were paid into the soccer camp.  The money was put into the camp, and was used to cover expenses with some of it eventually ending up with Laura.  Laura created what amounted to first drafts of the player profiles by going on the internet and imagining what honors that particular student might have attained if the student was in fact a USC caliber athlete, which they were not.  As Laura learned later, her drafts were often not the final drafts, but were edited by Singer, Donna Heinel and/or others before being submitted to USC.

Eventually, Ali K was fired at USC because the team was not winning enough.  Laura was retained a month or two longer, until the new coach came on board.  There was still a Singer student in the pipeline at that point and Ali K asked Laura to communicate with Donna Heinel to make sure that student was admitted.  Before that, Laura had not had contact with Heinel about the scheme

Ali K and Laura were now on the outside of the athletic department of USC.  Ali K told Laura that he was having trouble finding a job and he needed money, so he wanted to continue to work with Singer.  Toward that end, he told Singer that Laura would continue making the profiles so that Ali K could get credit with Singer and get paid.  Ali K then informed Laura that she would still be working with Singer.  Laura believes that Ali K was receiving $25,000 for each Singer student he was involved with after being fired.  Laura, however, stopped receiving any substantial payments, and was only paid a few thousand dollars over the next several years as she made profiles for Singer.  Unlike Ali K, Laura had found employment quickly at a job she loved.  Unfortunately, she continued to make profiles for Singer out of a sense of misplaced loyalty to Ali K.  Again, this is no defense, but a window into her decision-making process.

Laura was arrested on March 12, 2019. The arrest shattered her world and opened her eyes to the problems she had brought on herself through blind allegiance to others. She immediately sought to try to make amends for the wrongs she had done and the damage that had resulted. On Monday March 25, 2019, at 8:30 in the morning – the first day the government was available due to a vacation – Laura was in the US Attorney's Office confessing and beginning her cooperation. As she testified in the trial before Judge Gorton, her conscience required no less:

```
I'm here solely to tell the truth, to take
responsibility. Every day I feel ashamed and embarrassed
for what I've done, for the disappointment that I've caused
family and friends, and I have two daughters that they need
their mom to be a role model and I need to show them you
take responsibility even when you really messed up, which
is what I've done. So, for me, however it turns out, it
turns out. I'm here because I need to tell the truth.
That's all I have left right now.[1]
```

The AUSA who was then in charge of the case wrote that Laura was the "first in the door" of all the cooperators, which is significant. In fact, her cooperation was made public on April 23, 2019 in a press release from the Office of the United States Attorney. All of the remaining defendants were thus on notice of Laura's cooperation. This alone substantially assisted the prosecution. After all, if the person who helped create the player profiles was now admitting that they were false, what chance did the other defendants have of convincing a jury that the students were actual athletes? Accordingly, Laura deserves credit for influencing most of the guilty pleas that followed, certainly in the player profile portion of the case. As shown by her many interviews with the government and her testimony in two trials, Laura was a credible and fulsome cooperator. And, unlike other cooperators in this case, she only told the truth. With

---

[1] Transcript of Wilson et al trial, pp. 92-93. Because that trial occurred before a different judge, a copy of the transcript of Ms. Janke's testimony in the Wilson trial is attached to this memo.

Rick Singer seemingly too toxic to call as a witness, Laura's importance as a credible cooperator increased dramatically.

In addition to being honest and forthright about her actions, Laura is truly remorseful for her conduct. There will be few, if any, defendants who appear before this Court for sentencing who are more remorseful than Laura Janke. This memo is inadequate to describe the depths of her regret. Many defendants regret that they were caught, of course. True remorse, however, requires understanding the ways in which your conduct has hurt others outside of yourself. During the Wilson trial, Laura testified that:

```
I know that lying is wrong and I was raised by my family
to be better. I was raised to have morals and values and
raised to know that lying is wrong and is not appropriate
and I completely put all that aside and continued to lie
throughout this process, and that is wrong.

Q. And who did you feel that you were lying to?

A. I was lying to the universities. I was lying to
admissions. And even furthermore, I know what it takes to
be a Division 1 athlete. It takes a lot of commitment, a
lot of dedication, and it's something that you don't take
lightly, because it's very hard to do and in doing this –
[i]n doing this and creating these profiles and lying about
that, I basically devalued and underscored the commitment
that it takes for an athlete to play and to be given the
opportunity.[2]
```

Laura knows, and feels very deeply, that her crime hurt many people outside of herself, from USC to the athletes to her family and friends. The character letters written by those who have known her best and longest are revealing. Those letters show both how giving Laura has been to so many people in her life and how out of character it is for her to have participated in this scheme. The letters are significant in another way as well. Many times, there is a fair

---

[2] Wilson trial transcript pp.50-51

question as to exactly how much the writers of character letters understand about the crime the defendant has committed.  There is no such question, here, however.  To Laura's everlasting shame and humiliation, this case has been covered extensively by every media outlet in the country.  The fifty-one people who wrote those letters did not write in darkness. They know exactly what Laura did wrong, and they still support her unwaveringly.  She has earned that support through a life well-lived, with one singular (albeit criminal) exception.  In fact, Laura aspires to continue living a giving life by establishing camps for adolescents centered around various experiences they may have shared - victims of bullying together at a camp, for example, or children of divorced parents together at a different session.  She understands the loneliness a person can feel when dealing with significant issues and she wants to be able to help those people.

There is no denying Laura's conduct in this case.  At the same time, there is no denying her essentially good nature.  Laura Janke is a fine human being, despite her conduct in this matter.

For all of the reasons stated in this memorandum, as well the reasons set forth in the government's motion for downward departure pursuant to U.S.S.G 5K1.1, we submit that a sentence of time served is the appropriate sentence for Ms. Janke in this case.

Respectfully submitted,

/s/Stephen G. Huggard
Stephen G. Huggard (BBO#622699)
stevehuggard@huggardlaw.com
HUGGARD LAW LLC
101 Arch Street, 8th Floor
Boston, Massachusetts 02110
(617) 875-2622

**CERTIFICATE OF SERVICE**

    I, Stephen G. Huggard, hereby certify that, pursuant to Local Rule 5.2(b)(2), on this 21st day of June 2022, the foregoing document was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, and will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing.

                                            /s/Stephen G. Huggard